1   WILLIAM J. FRIMEL (Bar No. 160287)
2   Seubert Frimel & Warner LLP
    1075 Curtis Street
3   Menlo Park, CA  94025
    Tel:  650.322.3048
4   Fax:  650.833.2976
    bill@sffwlaw.com
5
6   Attorneys for Respondent
    CAPITAL ASSET EXCHANGE & TRADING LLC
7
8                  **UNITED STATES DISTRICT COURT**
9
10                 **NORTHERN DISTRICT OF CALIFORNIA**
11
12  SHANGHAI TYRON                          Case No. 5:24-cv-08551-EJD
    SEMICONDUCTOR
13  EQUIPMENT CO., LTD., a Chinese          ***EX PARTE* APPLICATION BY**
    corporation,                            **RESPONDENT CAPITAL ASSET**
                                            **EXCHANGE & TRADING LLC TO STAY**
14                  Petitioner,             **ENTRY OF STIPULATED JUDGMENT,**
                                            **OR, IN THE ALTERNATIVE, TO STAY**
15          v.                              **ENFORCEMENT OF STIPULATED**
                                            **JUDGMENT; MEMORANDUM OF**
16  CAPITAL ASSET EXCHANGE &                **POINTS AND AUTHORITIES IN**
    TRADING LLC, a California limited       **SUPPORT THEREOF**
17  liability company,
                                            Hearing Date:  [To be assigned]
18                  Respondent.             Hearing Time:  [To be assigned]
                                            Courtroom:  4
19                                          Judge:  Hon. Edward J. Davila
20
21
22
23
24
25
26
27
28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**NOTICE OF *EX PARTE* APPLICATION**

PLEASE TAKE NOTICE that, as soon as counsel for Respondent Capital Asset Exchange & Trading LLC ("CAET") may be heard, in Courtroom 4 of the United States District Court for the Northern District of California, located at 280 South 1st Street, San Jose, California 95113, CAET will, and hereby does, apply *ex parte,* pursuant to Fed. R. Civ. P. 60 and 62, for an order staying the entry of the stipulated judgment described in the settlement agreement executed by CAET and Petitioner Shanghai Tyron Semiconductor Equipment Co., Ltd. ("Tyron") dated as of February 1, 2025 (the "Stipulated Judgment"), until such time as the U.S. Office of Foreign Assets Control ("OFAC") has either approved or denied a license, or given guidance, regarding CAET's ability to refund money paid to CAET by Tyron.  In the alternative, CAET applies, pursuant to Fed. R. Civ. P. 60 and 62, for an order staying the execution of the Stipulated Judgment until OFAC has either approved or denied a license, or given guidance, regarding CAET's ability to refund money paid to CAET by Tyron.  CAET's application shall be based on this Application, the accompanying Memorandum of Points and Authorities, the Declarations of Ryan Jacob, Austin Gill and William J. Frimel, and such other and further materials as may be presented to the Court at or before the hearing on this Application.

**_EX PARTE_ APPLICATION**

CAET applies *ex parte* for the above-described relief on the following grounds:

1. The settlement agreement between CAET and Tyron dated as of February 1, 2025 (the "Settlement Agreement") provides that CAET will make a series of payments to Tyron over time totaling $4,050,000.

2. The Settlement Agreement further provides that, if CAET does not timely make a scheduled payment, Tyron shall have the ability to enter and execute the Stipulated Judgment attached as Exhibit A to the Settlement Agreement, under which any portion of the foregoing amount remaining unpaid shall become due and payable.

3. The payments CAET agreed to make in the Settlement Agreement are intended to return funds Tyron paid to CAET, which were the subject of the arbitration at issue in this matter.

4. The next payment by CAET under the Settlement Agreement is due on April 15,

2025.

5.      On March 31, 2025, agents of the U.S. Bureau of Industry and Security ("BIS") and Federal Bureau of Investigation ("FBI") advised CAET that CAET should not return the funds paid to it by Tyron absent a license, or interpretive guidance, authorizing such payment from the U.S. Office of Foreign Assets Control ("OFAC").

6.      Moreover, publicly available information retrieved by CAET reflects that the members of Tyron's executive team are all affiliated with Chinese entities on either the BIS's Entity List, 15 C.F.R. § 744, Supp. No. 4, or its Military End User List, 15 C.F.R. § 744, Supp. No. 7, which are lists of entities the BIS has determined to pose potential threats to U.S. national security.

7.      Failure to comply with BIS regulations carries potential civil and criminal penalties.  *See, e.g.*, 50 U.S.C. § 4819(b).

8.      CAET intends to request OFAC's permission to refund Tyron's funds as soon as possible.

9.      As OFAC is unlikely to respond to CAET's request for a license or guidance by April 15, 2025, *i.e.*, the date on which CAET's next payment is due under the Settlement Agreement, there is a significant risk that Tyron will enter and begin executing upon the Stipulated Judgment, and thus that CAET will be required to refund money to Tyron, in potential violation of BIS and other federal regulations.

10.      Thus, CAET respectfully requests that the Court stay the entry of the Stipulated Judgment until such time as OFAC has either approved or denied a license, or given guidance, regarding CAET's ability to refund money paid to CAET by Tyron, or, in the alternative, to stay the execution of the judgment pending such a response by OFAC.

11.      On April 4, 2025, counsel for CAET advised counsel for Tyron, via telephone and email, that CAET would be making this *ex parte* application.  (*See* Decl. of William J. Frimel, Apr. 7, 2025, ¶ 2 & Exh. A.)

1

2

Dated:  April 7, 2025

/s/ William J. Frimel

3

WILLIAM J. FRIMEL
Attorneys for Respondent
CAPITAL ASSET EXCHANGE & TRADING LLC

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-iii-

# TABLE OF CONTENTS

Page(s)

INTRODUCTION AND RELEVANT FACTS                                                          1

   A.  The Relevant Federal Regulations                                             2

     1.  The Entity and Military End User Lists                                    2

     2.  The Commerce Country Chart                                               3

     3.  Regulations Regarding Military Intelligence End Uses and Users          4

   B.  CAET's Due Diligence                                                         4

   C.  The Parties' Transaction and Settlement                                      5

   D.  CAET's Communications with Federal Regulators                               6

LEGAL ARGUMENT                                                                           6

I.     A STAY IS PROPER UNDER THE PRIMARY JURISDICTION
       DOCTRINE AND THE COURT'S DISCRETIONARY AUTHORITY                        7

II.    CAET WILL SUFFER IRREPARABLE INJURY ABSENT A STAY                         11

III.   A STAY WILL NOT SUBSTANTIALLY INJURE TYRON                               12

IV.   A STAY IS IN THE PUBLIC INTEREST                                          12

CONCLUSION                                                                              13

# TABLE OF AUTHORITIES

**Page(s)**

*In re 650 Fifth Ave.*, No. 08 Civ. 10934, 2013 WL 2451067 (S.D.N.Y. Jun. 6, 2013) ............ 10

*ASCII Corp. v. STD Ent'mt. USA, Inc.*, 844 F. Supp. 1378 (N.D. Cal. 1994) ............ 11

*Barrera v. Comcast Holdings Corp.*, No. 14-cv-00343, 2014 WL 1942829 (N.D. Cal. May 12, 2014) ............ 1, 11

*Cal. Apt. Ass'n. v. San Diego Cty. Apt. Ass'n., Inc.*, No. 11cv300, 2011 WL 1002667 (S.D. Cal. Mar. 18, 2011) ............ 12

*Calmat Co. v. U.S. Dept. of Labor*, 364 F.3d 1117 (9th Cir. 2004) ............ 8 n.3

*Chamber of Commerce v. Becerra*, 438 F. Supp. 3d 1078 (E.D. Cal. 2020) ............ 11

*Changji Esquel Textile Co. v. Raimondo*, 573 F. Supp. 3d 104 (D.D.C. 2021) ............ 2

*Chevron U.S.A. Inc. v. Natural Resources Def. Council*, 467 U.S. 837 (1984) ............ 11

*Cuviello v. City of Vallejo,* 944 F.3d 816 (9th Cir. 2019) ............ 11

*Drew v. Equifax Inf. Servs., LLC*, 690 F.3d 1100 (9th Cir. 2012) ............ 8 n.3

*Eberle v. Smith*, No. 07-CV-0120, 2008 WL 238450 (S.D. Cal. Jan. 29, 2008) ............ 12-13

*Fulmen Co. v. Offc. of Foreign Assets Control*, 547 F. Supp. 3d 13 (D.D.C. 2020) ............ 9, 10

*Gentry v. Cellco Pshp.*, No. CV 05-7888, 2006 WL 6927883 (C.D. Cal. Mar. 22, 2006) ............ 9

*GPAC, Inc. v. D.W.W. Enters., Inc.*, 144 F.R.D. 60 (D. N.J. 1992) ............ 11

*United States v. Guo*, 634 F.3d 1119 (9th Cir. 2011) ............ 3

*Hilton v. Braunskill*, 481 U.S. 770 (1987) ............ 7

*Islamic Am. Relief Agency v. Gonzales*, 477 F.3d 728 (D.C. Cir. 2007) ............ 10

*Lopez v. Heckler*, 713 F.2d 1432 (9th Cir. 1983) ............ 7

*Leyra v. Certified Grocers of Cal.,* 593 F.2d 857 (9th Cir. 1979) ............ 10

*U.S. v. Moyer*, No. C 07-00510, 2008 WL 3478063 (N.D. Cal. Aug. 12, 2008) ............ 7

1

*Nia v. Bank of Am., N.A.*, 725 F. Supp. 3d 1150 (S.D. Cal. 2024)    6 n.2

2

3

*Ponzio v. 3M Co.*, No. 2:16-CV-3521, 2016 WL 6407376 (C.D. Cal. Oct. 28, 2016)    11

4

*Quinones v. Chase Bank USA, N.A.*, No. 09cv2748, 2012 WL 1530155 (S.D. Cal. May 1, 2012)    6, 7

5

6

*Reese v. Odwalla, Inc.*, 30 F. Supp. 3d 935 (N.D. Cal. 2014)    10

7

*Reiter v. Cooper*, 507 U.S. 258 (1993)    8

8

*Rent-A-Center, Inc. v. Canyon Tel. & Appliance Rental, Inc.*, 944 F.2d 597 (9th Cir. 1991)    12

9

10

*Saubers v. Kashi Co.,* 39 F. Supp. 3d 1108 (S.D. Cal. 2014)    9

11

*United States v. Shih*, 73 F.4th 1077 (9th Cir. 2023)    2

12

*Syntek Semiconductor Co. v. Microchip Tech.*, 307 F.3d 775 (9th Cir. 2002)    8

13

14

*Terry v. Register Tapes Unlimited, Inc.,* No. 2:16-cv-0806, 2020 WL 3819417 (E.D. Cal. Jul. 8, 2020)    12

15

16

*Walnut Creek Manor, LLC v. Mayhew Ctr., LLC*, No. 09cv2748-AJB, 07-5664-CW, 2010 WL 653561 (N.D. Cal. 2010)    7

17

*Zaborowski v. MHN Govt. Servs., Inc.,* No. C 12–05109, 2013 WL 1832638 (N.D. Cal. May 1, 2013)    12

18

19

20

21

22

23

24

25

26

27

28

**<u>INTRODUCTION AND RELEVANT FACTS</u>**

Petitioner Shanghai Tyron Semiconductor Equipment Co., Ltd. ("Tyron") and Respondent Capital Asset Exchange & Trading LLC ("CAET") entered into a settlement agreement (the "Settlement Agreement") providing for CAET to make a series of payments to Tyron totaling roughly $4 million, and that, if CAET failed to make a payment, Tyron would be permitted to enter and execute a stipulated judgment against CAET (the "Stipulated Judgment") requiring the immediate payment of any part of that sum not yet paid. On March 31, 2025, agents of the Bureau of Industry and Security, a division of the U.S. Department of Commerce ("BIS"), and the Federal Bureau of Investigation ("FBI"), advised CAET that it should not make any further payments to Tyron without a license or guidance from the Office of Foreign Assets Control ("OFAC") permitting CAET to do so. This presents a substantial concern for CAET, as violations of BIS regulations may give rise to criminal penalties. *See, e.g.*, 50 U.S.C. § 4819(b).

CAET intends to request OFAC's permission to refund Tyron's payment as soon as possible. However, CAET is required, under the parties' agreement, to make its next payment to Tyron by April 15, 2025, and failing to make that payment would entitle Tyron to enter the Stipulated Judgment and force CAET to make payments to Tyron in contravention of the government's direction. Thus, CAET respectfully submits this *ex parte* application, pursuant to Fed. R. Civ. P. 60 and 62, to stay the entry, or, in the alternative, the execution, of the Stipulated Judgment pending OFAC's determination of CAET's request. Such a stay is amply justified in light of OFAC's special competence in regulating transactions raising potential national security concerns and the complexity of the regulations at issue. *See, e.g., Barrera v. Comcast Holdings Corp.*, No. 14-cv-00343, 2014 WL 1942829, *2-3 (N.D. Cal. May 12, 2014) (entering stay on the ground that "the doctrine of primary jurisdiction applies because the very issue on which Plaintiff's claims are predicated — liability under the [Telephone Consumer Protection Act ("TCPA")] when a wireless telephone user has changed phone numbers — is currently before the" Federal Communications Commission ("FCC"), and "Congress has placed the interpretation and enforcement of the TCPA's provisions within the primary jurisdiction of the FCC").

1

**A.    The Relevant Federal Regulations**

2      In August 2022, CAET and Tyron, a Chinese corporation, executed contracts in which

3  Tyron agreed to purchase two Nikon NSR-2205i12D photolithography steppers (the

4  "Equipment") from CAET, and Tyron paid CAET for the Equipment.  (Decl. of Austin Gill, Apr.

5  6, 2025 ("Gill Decl."), ¶ 2.)  Photolithography steppers, which are used to manufacture

6  semiconductors, create circuit elements on the surface of silicon wafers.  (*Id.* ¶ 3.)

7      Before shipping the Equipment, CAET was required, under the BIS's Export

8  Administration Regulations (the "EARs"), to perform research regarding the intended end user,

9  and intended end use, of the Equipment to ensure that the transaction was permissible.  "The

10  Export Administration Regulations ('EARs') . . . impose controls on certain exports to 'serve the

11  national security, foreign policy, nonproliferation of weapons of mass destruction, and other

12  interests of the United States.'"  *United States v. Shih*, 73 F.4th 1077, 1089 (9th Cir. 2023)

13  (quoting 15 C.F.R. §§ 730.1, 730.6).  "Most items subject to the EARs are identified on a BIS

14  Commerce Control List and given an Export Control Classification Number ('ECCN')."  *Id.* at

15  1090 (citing 15 C.F.R. § 774, Supp. No. 1).  The Equipment falls within ECCN 3B001.f, which

16  applies to "[l]ithography equipment," including but not limited to lithography equipment

17  consisting of "[a]lign and expose step and repeat (direct step on wafer) or step and scan (scanner)

18  equipment for wafer processing using photo-optical or X-ray methods."  15 C.F.R. § 774, Supp.

19  No. 1, Cat. 3.

20

**1.    The Entity and Military End User Lists**

21      The BIS "maintains [an] 'Entity List,' which includes foreign persons 'reasonably

22  believed to be involved, or to pose a significant risk of being or becoming involved, in activities

23  contrary to the national security or foreign policy interests of the United States.'"  *Changji Esquel*

24  *Textile Co. v. Raimondo*, 573 F. Supp. 3d 104, 108 (D.D.C. 2021) (internal quotation marks

25  omitted).  "Listed entities are 'prohibited from receiving some or all items subject to the EARs

26  unless the exporter secures a license.'"  *Id.* at 109.  Except for "items 'necessary to detect,

27  identify and treat infectious disease,'" "all other license applications are presumptively denied for

28  most items."  *Id.* (citing 85 Fed. Reg. at 44,160).  Thus, the Equipment cannot be exported to an

entity on the Entity List without a license.

The Department of Commerce also maintains a "Military End User List," which likewise imposes a "license requirement" for "the export, reexport, or transfer (in-country) of any item subject to the EAR listed in supplement no. 2 to part 744" as to a list of entities.  15 C.F.R. § 744, Supp. 7.  Items that cannot be exported to entities on the Military End User ("MEU") List without a license include, among other things, "[p]ositive resists designed for semiconductor lithography specially adjusted (optimized) for use at wavelengths between 370 and 245 nm."  15 C.F.R. § 744, Supp. No. 2(3)(vi).  A positive resist is a semiconductor manufacturing component used in conjunction with photolithography steppers such as the Equipment, and it has multiple military applications, including missile guidance systems.  (Gill Decl. ¶ 4.)

### 2.  The Commerce Country Chart

Moreover, "Supplement No. 1 to Part 738," *i.e.*, 15 C.F.R. § 738.1 *et seq.*, "contains the Commerce Country Chart, which lists the [export] restrictions relevant to each foreign country by setting out the reasons for control applicable to each country.  A person can determine whether the regulations control the export of a particular item by (1) connecting the item to the relevant description in the Commerce Control List," *i.e.*, 15 C.F.R. § 774, Supp. 3 *et seq.*, "(2) identifying the reasons for control applicable to that item; and (3) looking to see whether any of the reasons for control of that item are checked off next to the relevant country on the Commerce Country Chart."  *United States v. Guo*, 634 F.3d 1119, 1122 (9th Cir. 2011).

Per the Commerce Control List, equipment classified as ECCN 3B001.f, such as the Equipment, cannot be exported, without a license, to "a destination specified in Country Group D:5 of supplement no. 1 to part 740 of the EAR."  15 C.F.R. § 774, Supp. 1, Cat. 3.  The countries listed in that section include China.  *See* 15 C.F.R. § 740, Supp. 1 (Country Group D).  Thus, the EARs did not permit CAET to export the Equipment to China without a license from the BIS.  *See Guo*, 634 F.3d at 1122 (as "[t]he entry for China on the Commerce Country Chart shows restrictions for both national security and regional stability," "the regulations required Defendant to obtain an export license before taking his thermal imaging cameras to China, and 50 U.S.C. § 1705(a) made it a crime for him knowingly to attempt to export the cameras without

1  such a license").

2  **3.  Regulations Regarding Military Intelligence End Uses and Users**

3  Under the EARs, "no 'U.S. person' may, without a license from BIS, 'support' . . . . [a]

4  'military-intelligence end use' or a 'military-intelligence end user,' as defined in § 744.22(f), in . .

5  . the People's Republic of China . . . ."  15 C.F.R. § 744.6(b)(5).  A "military-intelligence end

6  use" includes "the 'development,' 'production,' operation, installation . . ., or incorporation into,

7  items described on the U.S. Munitions List (USML)," *id.* § 744.22(f)(1), which in turn includes

8  hardware and software for the manufacture, guidance and detection of missiles and bombs, 22

9  C.F.R. § 121.1, Cat. IV(a).  "Support" is defined as, *inter alia*, "[p]erforming any contract,

10  service, or employment you know may assist or benefit any of the end uses or end users described

11  in paragraphs (b)(1) through (5) of this section," which include "military-intelligence end users,"

12  "including, but not limited to:  Ordering, buying, removing, concealing, storing, using, selling,

13  loaning, disposing, servicing, financing, transporting, freight forwarding, or conducting

14  negotiations in furtherance of."  15 C.F.R. § 744.6(b)(6)(iv).  Thus, a U.S. exporter may not

15  "perform[] any contract" with, or otherwise provide "support" to, a "military-intelligence end

16  user," and "supporting" includes activities such as performing under the parties' contract,

17  "servicing," "financing" and "conducting negotiations."

18  **B.  CAET's Due Diligence**

19  As the EARs require exporters, before shipping restricted goods, to "[d]ecide whether

20  there are 'red flags,'" which means "[t]ake into account any abnormal circumstances in a

21  transaction that indicate that the export may be destined for an inappropriate end-use, end-user, or

22  destination," 15 C.F.R. § 732, Supp. 3, § (a)(1), CAET reviewed publicly available information

23  regarding the affiliations of Tyron's executives and shareholders.  This research revealed, *inter*

24  *alia*, that (1) Tyron's Managing Director, Hua Li,[1] is a professor at the Shanghai Institute of

25  Microsystem and Information Technology (Gill Decl. Exhs. A, B), which is on the Entity List, 15

26  _____

27  [1] Tyron's evidence in support of its petition also confirms that Hua Li is Tyron's "General

28  Manager."  (Decl. of Zhener Low, Dec. 3, 2024, Dkt. No. 6-2, Exh. 4, at 9.)

C.F.R. § 744, Supp. No. 4; and (2) Tyron's Executive Director, Supervisor and Head of Finance (Kang Kai, Neng Zhang and Dan Yu) are researchers at, respectively, the University of Electronic Science and Technology of China, Tsinghua University Institute of Microelectronics, and Zhejiang University of Technology (Gill Decl. Exhs. A, C-E), which are on the MEU List, 15 C.F.R. § 744, Supp. No. 7 (*i.e.*, they are considered military end users by the BIS).

Based on these facts, CAET concluded that U.S. export regulations prohibited CAET from delivering the Equipment to Tyron.  (Gill Decl. ¶ 12.)  CAET also considered that the Tyron entity may serve as a conduit between non-Chinese sellers of semiconductor manufacturing equipment ("SME") such as CAET, on one hand, and Chinese entities prohibited by various countries' regulations from receiving certain types of SME, on the other.  (*Id.* ¶ 11.)  Thus, CAET was also concerned that, in light of, among other regulations, 15 C.F.R. § 744.6(b)(5)'s prohibition on "supporting" "military intelligence end users," refunding Tyron's payments might also be prohibited.  (*Id.* ¶ 12.)  CAET therefore advised Tyron that CAET needed to further investigate regarding whether completing the transaction would comply with U.S. trade regulations, and was unable to deliver the Equipment or refund Tyron's payments until it did so. (*Id.* ¶ 13.)

### C.    The Parties' Transaction and Settlement

Certain of the parties' agreements called for arbitration of any dispute arising out of the contracts before the China International Economic and Trade Arbitration Commission ("CIETAC").  Tyron submitted an "Application for Emergency Arbitration Procedures" to CIETAC on August 30, 2024, and CIETAC appointed an "Emergency Arbitrator" and scheduled an emergency hearing for October 20, 2024.  (Pet.'s Mem. of Ps. & As. in Supp. of Pet. to Confirm, Dec. 3, 2024, Dkt. No. 7, at 3-5.)  CAET did not receive adequate notice of the emergency hearing (Gill Decl. ¶¶ 14-22), and thus did not attend the hearing.  The Emergency Arbitrator entered an order purporting to freeze $5.3 million of CAET's assets pending a final order by the arbitral panel.  (Decl. of Zhener Low, Dec. 3, 2024, Dkt. No. 6-2, Exh. 1, at 4.) Tyron brought this action seeking to confirm the emergency award.

The parties entered a settlement agreement in which Tyron agreed to dismiss the

1   arbitration and this action in exchange for a series of payments totaling $4,050,000 by CAET.

2   (Gill Decl. Exh. G, ¶ 1.)  The agreement provides, *inter alia*, that, "[i]n the event CAET fails to

3   make any payment" called for in the agreement "by the deadline to make such payment . . .,

4   Tyron shall have the right, effective immediately, to file and/or enforce the Stipulated Judgment

5   attached hereto as Exhibit A in the United States District Court for the Northern District of

6   California." (*Id.* Exh. G, ¶ 2.)  The Stipulated Judgment provides that judgment shall be entered

7   in favor of Tyron for any portion of the $4,050,000 that remains unpaid. (*Id.* Exh. A to Exh. G.)

8           **D.     CAET's Communications with Federal Regulators**

9           In March 2025, FBI and BIS agents contacted CAET to discuss a Chinese entity other

10  than Tyron with which CAET had transacted. (Decl. of Ryan Jacob, Apr. 5, 2025 ("Jacob

11  Decl."), ¶ 2.)  When asked by the FBI and BIS about other customers regarding which CAET had

12  past or current regulatory concerns, CAET was compelled to mention its transactions with several

13  other Chinese entities, including Tyron, and thereafter sent requested information to the FBI and

14  BIS concerning those entities. (*Id.* ¶ 3.)  On March 31, 2025, CAET had another phone call with

15  the FBI and BIS agents, in which the agents advised CAET that CAET should not refund the

16  money it received from Tyron, and other Chinese entities CAET discussed with the agents,

17  without obtaining a license and/or advisory opinion from OFAC[2] permitting CAET to do so. (*Id.*

18  ¶ 4.)  CAET intends to apply for a license or advisory opinion from OFAC to that effect as soon

19  as possible. (*Id.* ¶ 5.)

20                           **LEGAL ARGUMENT**

21          "Except as provided in [Fed. R. Civ. P.] 62(c) and (d)," *i.e.*, in the case of a stay of an

22  injunction, or an injunction pending an appeal, "execution on a judgment and proceedings to

23  enforce it are stayed for 30 days after its entry, unless the court orders otherwise." Fed. R. Civ. P.

24  62(a). "After the automatic stay, the Court may continue the stay during various post-judgment

25  motions under Rule 62(b) . . . ." *Quinones v. Chase Bank USA, N.A.*, No. 09cv2748, 2012 WL

26  _____

27  [2] OFAC "administers and enforces economic and trade sanctions." *Nia v. Bank of Am., N.A.*, 725

28  F. Supp. 3d 1150, 1166 (S.D. Cal. 2024).

1  1530155, *2 (S.D. Cal. May 1, 2012); *see also Walnut Creek Manor, LLC v. Mayhew Ctr., LLC*,

2  No. 09cv2748-AJB, 2010 WL 653561, *7 (N.D. Cal. 2010) (same).

3       An order staying execution of the judgment can be entered on an *ex parte* basis where, as

4  here, the party seeking the *ex parte* order proceeds pursuant to Fed. R. Civ. P. 60 and 62. *See,*

5  *e.g., U.S. v. Moyer*, No. C 07-00510, 2008 WL 3478063, *4-5 (N.D. Cal. Aug. 12, 2008)

6  (defendant "complied with Local Rule 7-10, because he filed his Motion under Federal Rule of

7  Civil Procedure 60, which entitled him to request a stay *ex parte* under Federal Rule of Civil

8  Procedure 62," and "Rule 62 *impliedly* provides he may" "request a stay *ex parte*," "as it allows

9  the Court to issue a stay prior to the hearing on his Motion, or even prior to its service on the

10 other parties"); *Quinones*, 2012 WL 1530155, *1, 3 (granting "*ex parte* application to stay

11 enforcement" of portion of judgment concerning attorneys' fees).

12      The "factors [that] should be used to determine whether or not a stay would be appropriate

13 under Rule 62(b)" include "(1) whether the stay applicant has made a strong showing that he is

14 likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay;

15 (3) whether issuance of the stay will substantially injure the other parties interested in the

16 proceeding; and (4) where the public interest lies." *Moyer*, 2008 WL 3478063, *6 (quoting

17 *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)).  "In the Ninth Circuit, courts employ a sliding

18 scale to govern this determination: . . . . 'At one end of the continuum, the moving party is

19 required to show both a probability of success on the merits and the possibility of irreparable

20 injury.  At the other end of the continuum, the moving party must demonstrate that serious legal

21 questions are raised and that the balance of hardships tips sharply in its favor.'" *Id.* at *6 (quoting

22 *Lopez v. Heckler*, 713 F.2d 1432, 1435 (9th Cir. 1983)).  These factors support entering a stay.

23 **I.    A STAY IS PROPER UNDER THE PRIMARY JURISDICTION DOCTRINE AND**

24 **THE COURT'S DISCRETIONARY AUTHORITY**

25      As discussed, FBI and BIS agents advised CAET that CAET should not refund Tyron's

26 payment absent a license or guidance from OFAC permitting CAET to do so.  (Jacob Decl. ¶ 4.)[3]

27

28

1    Thus, CAET plans, as soon as possible, to request such a license or guidance from OFAC.  (*Id.* ¶

2    5.)  Entering a stay pending OFAC's resolution of CAET's request is proper under the primary

3    jurisdiction doctrine, which "is invoked to stay matters properly cognizable before a court while

4    the resolution of a relevant or determinative issue within the special competence of an

5    administrative agency is decided."  *Gentry v. Cellco Pshp.*, No. CV 05-7888, 2006 WL 6927883,

6    *2 (C.D. Cal. Mar. 22, 2006) (citing *Reiter v. Cooper*, 507 U.S. 258, 268 (1993)).  In determining

7    "whether to stay an action under the doctrine," "courts in this Circuit consider the following

8    factors:  (1) the need to resolve the issue; (2) whether the issue has been placed by Congress

9    within the jurisdiction of an administrative body having regulatory authority pursuant to a statute

10   that subjects an industry or activity to comprehensive regulation; and (3) whether that regulation

11   requires expertise or uniformity in administration."  *Id.* at *3 (citing *Syntek Semiconductor Co. v.

12   Microchip Tech.*, 307 F.3d 775, 781 (9th Cir. 2002)).  All of these factors support entering a stay.

13        *First*, OFAC's determination of CAET's request is important to the resolution of this

14   matter because, if OFAC denies CAET's request for a license or provides interpretive guidance

15   against refunding Tyron, CAET will be unable to lawfully make payments under the Settlement

16   Agreement or any judgment resulting from CAET's alleged failure to comply with that

17   agreement.  As discussed (Stmt. of Facts ("SOF") § A.3 *supra*), BIS regulations prohibit CAET

18   from "supporting" a "military-intelligence" "end use" or "end user," and "supporting" includes

---

20   [3] Notably, the referenced statements by the FBI and BIS agents are admissible because CAET is

21   offering the statements only to show that they were made, rather than for the truth of any matter

22   in the statements.  *See Drew v. Equifax Inf. Servs., LLC*, 690 F.3d 1100, 1108 (9th Cir. 2012)

23   (statement in credit report was offered "only to show that the 'statement . . . was made' rather

24   than for its truth," and thus was not hearsay); *Calmat Co. v. U.S. Dept. of Labor*, 364 F.3d 1117,

25   1124 (9th Cir. 2004) (witness's "statement that a supervisor told him that [complainant] was

26   disciplined for the confrontation" at issue was not hearsay because "the significance of [the] out-

27   of-court statement [lay] in the fact that the statement was made and not in the truth of the matter

28   asserted").

"[p]erforming any contract, service, or employment you know may assist or benefit" such an end use or end user, 15 C.F.R. § 744.6(b)(6)(iv), and CAET's payments pursuant to the Settlement Agreement would plainly amount to "performing a[] contract" for the purposes of this regulation. Moreover, as noted, CAET's due diligence revealed that Tyron likely is, or is closely affiliated with, such an end use or end user.  (SOF § B *supra*.)  Thus, there is a significant likelihood that CAET's request to refund Tyron will be denied by OFAC.  Accordingly, the "need to resolve the issue" factor weighs in favor of a stay.  *See Saubers v. Kashi Co.,* 39 F. Supp. 3d 1108, 1112 (S.D. Cal. 2014) (as "Plaintiffs' claims rely heavily, if not entirely, on the premise that the FDA has concluded that 'evaporated cane juice' is not the common or usual name for any sweetener," and "the FDA's articulation of its considered view on this matter will undoubtedly affect issues being litigated in this action," "application of the primary jurisdiction doctrine" to stay the case "is favored"); *see also Gentry*, 2006 WL 6927883, *3.

    *Second*, the issue to be resolved is plainly within OFAC's jurisdiction.  In 1994, the President issued an Executive Order pursuant to his authority under the International Emergency Economic Powers Act that "blocked all property and interests in property of . . . any foreign person" who has "engaged, or attempted to engage, in activities or transactions that have materially contributed to, or pose a risk of materially contributing to, the proliferation of weapons of mass destruction or their means of delivery (including missiles capable of delivering such weapons)," and those held by "any person determined by the Secretary of the Treasury . . . to be owned or controlled by, or acting or purporting to act for or on behalf of, directly or indirectly, any person whose property and interests in property are blocked pursuant to this order."  70 Fed. Reg. at 38567.  "The Secretary" of the Treasury "in turn delegated that authority to OFAC." *Fulmen Co. v. Offc. of Foreign Assets Control*, 547 F. Supp. 3d 13, 16 (D.D.C. 2020) (citing 31 C.F.R. §§ 539.802, 544.802).  In light of OFAC's authority to restrict the transfer of property contributing to the development of weapons of mass destruction, and the ability of the Equipment and related components to be used in the production of missile guidance systems and other military applications (Gill Decl. ¶ 4), OFAC plainly has jurisdiction to regulate CAET's potential return of the funds it received from Tyron.

*Third*, numerous courts have recognized OFAC's unique expertise in preventing the transfer of funds likely to be used for purposes contrary to U.S. national security interests, and the complexity of the regulations OFAC enforces. *See Fulmen Co.*, 547 F. Supp. 3d at 23 ("OFAC, in particular, is entitled to even greater deference" than a typical regulatory agency — "indeed, 'extreme[] deferen[ce]' — because its decisions implicate national security and foreign policy") (quoting *Islamic Am. Relief Agency v. Gonzales*, 477 F.3d 728, 734 (D.C. Cir. 2007)); *In re 650 Fifth Ave.*, No. 08 Civ. 10934, 2013 WL 2451067, *6 (S.D.N.Y. Jun. 6, 2013) ("Given OFAC's unique expertise in matters of terrorist finance and the sensitive nature of the investigations upon which OFAC makes its determinations, it is entitled to deference even greater than that afforded an administrative agency statutory interpretation under *Chevron*," *i.e.*, *Chevron U.S.A. Inc. v. Natural Resources Def. Council*, 467 U.S. 837, 844-45 (1984)).

Thus, all of the primary jurisdiction factors support staying this matter pending a response from OFAC to CAET's request for a license and/or interpretive guidance. *See Reese v. Odwalla, Inc.*, 30 F. Supp. 3d 935, 941 (N.D. Cal. 2014) (as "the dispute to be resolved is" whether "use of" a particular "ingredient name is misleading and prohibited under the" Food, Drug and Cosmetic Act, and "[t]he issue of proper declaration of ingredients on food labels is one as to which Congress vested the FDA with comprehensive regulatory authority," staying case under primary jurisdiction doctrine); *Barrera*, 2014 WL 1942829, *2 (entering stay on the ground that "the doctrine of primary jurisdiction applies because the very issue on which Plaintiff's claims are predicated — liability under the [Telephone Consumer Protection Act] when a wireless telephone user has changed phone numbers — is currently before the" Federal Communications Commission).

Even if the primary jurisdiction doctrine does not apply, the Court has "broad discretion to stay proceedings as an incident to its power to control its own docket." *Leyra v. Certified Grocers of Cal.*, 593 F.2d 857, 863-64 (9th Cir. 1979). "In determining whether to grant a stay, courts generally consider whether doing so would 'cause undue prejudice or present a clear tactical disadvantage to the non-moving party.' . . . . Other factors considered are 'the stage in the litigation, [whether] discovery [is] or [will] be almost completed, [and whether] the matter [has]

1   been marked for trial.'" *ASCII Corp. v. STD Ent'mt. USA, Inc.*, 844 F. Supp. 1378, 1380 (N.D.

2   Cal. 1994) (quoting *GPAC, Inc. v. D.W.W. Enters., Inc.*, 144 F.R.D. 60, 63-64 (D. N.J. 1992)).

3   Here, as discussed below (*see* § III *infra*), unless OFAC denies CAET permission to send funds to

4   Tyron, Tyron will suffer, at most, a delay in its receipt of the money, and no discovery or trial has

5   occurred or been scheduled in this matter.

6   **II.    CAET WILL SUFFER IRREPARABLE INJURY ABSENT A STAY**

7          In light of the BIS's and FBI's statement that CAET should not refund Tyron's payment

8   absent permission from OFAC (Jacob Decl. ¶ 4), it is apparent that refunding the payment

9   without seeking OFAC's guidance could constitute a violation of the EARs or possibly other

10  regulations.  Violations of the EARs may result in criminal and civil penalties, including fines and

11  imprisonment.  *See* 50 U.S.C. § 4819(a)(2)(A) ("No person may engage in any conduct prohibited

12  by or contrary to, or refrain from engaging in any conduct required by . . . the Export

13  Administration Regulations," and a person who does so "shall be fined not more than $1,000,000;

14  and, . . . . in the case of the individual, shall be imprisoned for not more than 20 years, or both.");

15  *see also Ponzio v. 3M Co.*, No. 2:16-CV-3521, 2016 WL 6407376, *1 n.1 (C.D. Cal. Oct. 28,

16  2016) (describing these criminal and civil penalties).

17         It is well-established that the risk that the moving party will incur criminal penalties

18  constitutes irreparable harm.  *See Cuviello v. City of Vallejo,* 944 F.3d 816, 832 (9th Cir. 2019)

19  (because failure to comply with city's municipal code "constitutes either a misdemeanor or

20  infraction, subject to potential criminal penalties," plaintiff "has shown irreparable harm"

21  necessary to enjoin enforcement of ordinance); *Chamber of Commerce v. Becerra*, 438 F. Supp.

22  3d 1078, 1103-04 (E.D. Cal. 2020) (plaintiffs seeking injunction preventing enforcement of

23  statute "meet their burden of showing a likelihood of irreparable harm" because, if the statute

24  "takes effect, plaintiffs have provided sufficient evidence to show California businesses that rely

25  on arbitration agreements as a condition of employment will be forced to choose between risking

26  criminal or civil penalties, or both, . . . and foregoing the use of arbitration agreements altogether

27  to avoid penalties").

28

1    **III.    A STAY WILL NOT SUBSTANTIALLY INJURE TYRON**

2         To the extent Tyron suffers any injury due to entry of a stay, it will be a mere delay in

3    receiving the funds CAET agreed to pay under the Settlement Agreement, unless OFAC advises

4    that paying those funds is unlawful.  *See Terry v. Register Tapes Unlimited, Inc.,* No. 2:16-cv-

5    0806, 2020 WL 3819417, *2 (E.D. Cal. Jul. 8, 2020) (plaintiff's allegations of "personal hardship

6    he will experience if he loses his income from defendants" did not establish irreparable harm

7    because "[e]conomic harm is generally not considered irreparable"); *Cal. Apt. Ass'n. v. San Diego*

8    *Cty. Apt. Ass'n., Inc.*, No. 11cv300, 2011 WL 1002667, *2 (S.D. Cal. Mar. 18, 2011) (denying

9    motion for temporary restraining order preventing alleged copyright infringement because

10   "economic injury alone does not support a finding of irreparable harm, because such injury can be

11   remedied by a damage award") (quoting *Rent-A-Center, Inc. v. Canyon Tel. & Appliance Rental,*

12   *Inc.*, 944 F.2d 597, 603 (9th Cir. 1991)).

13   **IV.    A STAY IS IN THE PUBLIC INTEREST**

14        As discussed (*see* SOF § A *supra*), the relevant BIS regulations, such as the prohibition on

15   providing "support" to foreign military intelligence end users, 15 C.F.R. § 744.6(b)(6)(iv), are

16   geared toward protecting U.S. national security interests, Tyron has extensive ties with entities

17   recognized by U.S. regulators as posing threats to those interests (*see* SOF § B *supra*), and

18   OFAC's purpose is to regulate transactions that have significant national security implications

19   (*see* § I *supra*).  Accordingly, entering a stay until OFAC has the opportunity to evaluate any

20   proposed payment by CAET to Tyron would be in the public interest.  The requested stay would

21   also serve the goal of judicial efficiency, as it would cause a waste of judicial resources if Tyron

22   entered and began executing the Stipulated Judgment and OFAC later determined that CAET was

23   not legally permitted to refund Tyron's funds.  *See Zaborowski v. MHN Govt. Servs., Inc.,* No. C

24   12–05109, 2013 WL 1832638, *3 (N.D. Cal. May 1, 2013) (stay pending appeal would serve "the

25   public interest" because "judicial resources will be wasted if this case proceeds all the way to

26   trial, only for the Court to later discover that the case should have proceeded through

27   arbitration"); *Eberle v. Smith*, No. 07-CV-0120, 2008 WL 238450, *4 (S.D. Cal. Jan. 29, 2008)

28   (because "continuing to litigate in this Court during the pendency of the appeal" at issue would

-12-

1    pose a "risk of redundant or inconsistent actions," "the public interest weighs in favor of a stay").

2    <u>**CONCLUSION**</u>

3    For the foregoing reasons, the entry and/or execution of the Stipulated Judgment should

4    be stayed pending a determination by OFAC regarding the legality of the return of Tyron's

5    payment to CAET.

6    Dated:  April 7, 2025                    /s/ William J. Frimel

7                                              WILLIAM J. FRIMEL

8                                              Attorneys for Respondent
                                              CAPITAL ASSET EXCHANGE & TRADING LLC

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

RESPONDENT'S *EX PARTE* APP. TO STAY ENTRY OR EXECUTION OF JUDGMENT